UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM GOMEZ,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>METRO AIR SERVICE INC., et al.,<br><br>　　　　Defendants. | Case No. 2:22-cv-04979-SP<br><br>MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO REMAND |

# I.
# INTRODUCTION

On August 19, 2022, plaintiff Adam Gomez filed a motion to remand this case to the Superior Court of California, County of Los Angeles. Docket no. 24. Plaintiff's motion is supported by the declaration of plaintiff's counsel Piya Mukherjee and exhibit thereto. Defendant Metro Air Service, Inc. filed its opposition to the motion on September 6, 2022. Docket no. 26. Defendant's opposition is supported by the declaration of its payroll manager Ashley Brice ("9/6/22 Brice Decl."). On September 13, 2022, plaintiff filed his reply. Docket no. 27.

1  The matter came before the court for a hearing on September 27, 2022.
2 After carefully considering the information provided and arguments advanced and
3 the record before it, the court now grants plaintiff's motion to remand for the
4 reasons discussed below.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff filed the instant putative class action in the Los Angeles County Superior Court on May 5, 2022, on behalf of himself and those individuals who were employed by defendant in California at any time from four years prior to the Complaint's filing and classified as non-exempt. *See* docket no. 1, Compl. Plaintiff alleges he and other employees were not compensated with all their wages lawfully due in that, inter alia, they were from time to time: unable to take their meal and rest breaks or required to work while clocked out during their breaks; not provided complete and accurate wage statements; and not timely paid their correct wages. Plaintiff asserts nine causes of action under California's Business and Professions Code and Labor Code: (1) unfair competition; (2) failure to pay minimum wages; (3) failure to pay overtime wages; (3) failure to provide required meal periods; (5) failure to provide required rest periods; (6) failure to provide accurate itemized statements; (7) failure to reimburse employees for required expenses; (8) failure to provide wages when due; and (9) failure to pay sick pay wages. Plaintiff alleges the aggregate amount in controversy is less than $5 million.

On July 20, 2022, defendant removed the action to this court under the Class Action Fairness Act ("CAFA"), 28 U.S.C. 1332(d). *See* docket no. 1, Notice of Removal ("NOR")). Defendant's Notice of Removal was supported by, inter alia, an earlier declaration of payroll manager Ashley Brice ("7/20/22 Brice Decl."). Defendant contends the aggregate amount in controversy exceeds $5 million, there

are more than 100 proposed class members, and there is diversity of citizenship.

## III.

## DISCUSSION

Plaintiff argues removal was improper because defendant has failed to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million. Mtn. at 3-10. Based on allegations in the Complaint and the declaration of Ashley Brice and exhibits, defendant contends the amount in controversy conservatively reaches $10,696,664.50. Opp. at 11.

Any civil action over which the United States district courts have original jurisdiction may be removed to the district court for the district where such action is pending. 28 U.S.C. § 1441(a). A defendant seeking to remove a case to federal court must file a notice of removal containing a "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). But "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

The Class Action Fairness Act gives federal district courts original jurisdiction over any class action in which (1) the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs, (2) any member of a class of plaintiffs is diverse in citizenship from any defendant, and (3) the number of members of all proposed plaintiff classes exceeds 100 in the aggregate. 28 U.S.C. §§ 1332(d)(2), 1332(d)(5)(B); *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1195 (9th Cir. 2015). A notice of removal based on CAFA jurisdiction must include "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89, 135 S. Ct. 547, 190 L. Ed. 2d 495 (2014). "[N]o antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." *Id.* (citations omitted).

"[W]hen a defendant's assertion of the amount in controversy is challenged . . . both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Id.* at 88. But although both sides "may submit evidence supporting the amount in controversy," it is the defendant that has "the burden of supporting its 'jurisdictional allegations with competent proof.'" *Harris v. KM Indus., Inc.*, 980 F.3d 694, 699, 701 (9th Cir. 2020) (citation omitted). The plaintiff "need only challenge the truth of the defendant's jurisdictional allegations by making a reasoned argument as to why any assumptions on which they are based are not supported by evidence." *Id.* at 700 (citations omitted); *accord Waltz v. Wal-Mart Assocs., Inc.*, 2022 WL 489697, at *2 (C.D. Cal. Feb. 17, 2022) (the plaintiff "bears no burden, here, to introduce any evidence").

In determining the amount in controversy, the court considers the facts alleged in the complaint and "summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Fritsch v. Swift Trans. Co. of Ariz., LLC*, 899 F.3d 785, 793 (9th Cir. 2018). "[A] damages assessment may require a chain of reasoning that includes assumptions. When that is so, those assumptions cannot be pulled from thin air but need some reasonable ground underlying them." *Ibarra*, 775 F.3d at 1199.

Here, plaintiff's Complaint alleges a putative class of "all individuals who are or previously were employed by defendant in California, including any employees staffed with defendant by a third party, and classified as nonexempt employees [] at any time during the period beginning four (4) years prior to the filing of this Complaint and ending on the date as determined by the Court[]." Compl. ¶ 4. In support of its Notice of Removal, defendant submitted a declaration that it employed 1,750 nonexempt employees in California during the proposed class period, and the average hourly rate of all nonexempt employees in California

is $16.30. 7/20/22 Brice Decl. ¶¶ 3, 7. Based on this and various assumptions, in its Notice of Removal defendant asserted over $22 million was in controversy on plaintiff's rest break claim alone.

In moving to remand, plaintiff argues defendant's assumptions are unreasonable and unsupported. Defendant opposes the motion with additional evidence and new assertions of the amount in controversy. In particular, defendant now asserts the aggregate amount in controversy is at least $10,696,664.50, consisting of: $2,398,452 for rest break claims; $2,356,380 for waiting time penalties; $3,837,200 for wage statement penalties; and $2,104,632.50 for attorneys' fees. Opp. at 10-11. The court examines each in turn.

**A.     Rest Break Claims**

Under the California Industrial Welfare Commission's wage orders, employees are entitled to a ten-minute rest period for each four hours of work, or major fraction thereof, but are not entitled to a rest period on any day they work less than three and one-half hours; and are generally entitled to a 30-minute meal period if they work more than five hours in a day. The California Labor Code requires that an employer "pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday" a legally required meal or rest period is not provided. Cal. Lab. Code § 226.7(c). Defendant asserts $2,398,452 is a reasonable estimate of the amount in controversy for plaintiff's rest break claims. Opp. at 3-6. Plaintiff argues defendant's estimate lacks sufficient evidentiary support. Mtn. at 5-9.

In support of its estimate, defendant offers another declaration of Ashley Brice, who oversees payroll at Metro Air Service Inc., and is familiar with its payroll database, timekeeping requirements policies and procedures, and the recordation of time. 9/6/22 Brice Decl. ¶¶ 1-2. She is also familiar and has access to the company's human resources management system, payroll system, and

employee timekeeping system. *Id.* Based on her analysis of the data, Brice states defendant employed 2100 non-exempt employees in California from May 5, 2018 to the present (1805 of which are former employees), and 1777 non-exempt employees from May 5, 2019 to the present (1482 for which are former employees). *Id.* ¶ 7. Approximately 96% of these employees worked part-time, meaning 30 hours or less per week. *Id.* ¶ 8. She further states that "very few employees work less than four hours each shift," and "[v]ery few, if any, employees work less than five days per week." *Id.* Brice also sets forth the average hourly wages for non-exempt employees for each year of the proposed class period, ranging from $13.02 to $16.46. *Id.* ¶ 10.

Defendant calculates $2,398,452 as the amount in controversy for the rest break claims by working from a three-year limitation period and then assuming all 1777 putative class members worked five days a week, every week for over three years, at the highest average rate of pay during the class period, and had their right to a rest break violated on 10% of those days. In other words, 1777 class members x 164 weeks x 5 hours of premium pay per week x $16.46 per hour x 10% = $2,398,452.44. Opp. at 6. These assumptions are unsupported and flawed on multiple levels.

First, Brice declares that a total of 1777 employees worked since May 5, 2019, not that that was the average number who worked in any given week. She does not say how many worked in any given week, but does say that 1482 of the 1777 are former employees, which would seem to indicate that 295 are working there now. Whether it is fair to infer from this that 295 is a more reasonable estimate of the number working in any given week, the court cannot say. But whatever the average number of employees in a week, 1777 is plainly wrong, and likely by a long shot.

Second, since Brice also declares that 96% of the employees worked part-

6

time, there is no reason to assume all of these part-time employees worked five days a week. She does say "very few, if any" work less than five days a week, but "very few" is quite vague. "[T]he employer . . . has access to employment and payroll records that would allow it to provide more accurate figures." *Nolan v. Kayo Oil Co.*, 2011 WL 2650973, at *5 (N.D. Cal. July 6, 2011). Defendant did not bother to do so here.

Third, as set forth above, an employee needs to work at least three and one-half hours in a day to be entitled to any rest break. Brice declares that "very few" employees worked less than four hours each shift, but this again is vague. As such, the assumption that every employee worked not only five days a week, but five days in which the employee was entitled to a rest break, is unsupported and very likely incorrect, although how far off is impossible to determine on this record.

Fourth, the assumption that all of these employees are entitled to premium pay at the rate of $16.46 per hour since May 2019 is also contrary to the evidence, since Brice declares that did not become the average rate of pay until 2022. For 2019-21, the average ranged from $13.02 to $13.39.

Finally, defendant assumes it violated class members' right to a rest break 10% of the time – that is, one day every two weeks. Defendant provides no evidentiary support for this assumption. Since defendant "does not provide competent evidence, it must establish that its assumptions were 'founded on the allegations of the complaint.'" *Waltz*, 2022 WL 489697, at *2 (quoting *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 927 (9th Cir. 2019)). Defendant claims plaintiff's allegations of a "policy, practice, and procedure" of failing to provide meal and rest breaks justify its assumed 10% violation rate. Opp. at 4; *see* Compl. ¶¶ 12, 24, 29, 30, 33, 51, 91.

Allegations of "a 'pattern and practice' of doing something does not necessarily mean *always* doing something," and therefore the removing party still

"bears the burden to show that its estimated amount in controversy relied on reasonable assumptions." *Ibarra*, 775 F.3d at 1199. Defendant here cites "pattern and practice" cases in which courts have found assumed violation rates of between 10% and 60% to be reasonable. *See, e.g., Zamora v. Penske Truck Leasing Co., L.P.*, 2020 WL 4748460, at *5 (C.D. Cal. Aug. 17, 2020) ("assumed violation rate of 10% is reasonable in light of Plaintiffs' allegations that [defendant] engaged in a 'policy and practice' of various labor law violations"); *Chavez v. Pratt (Robert Mann Packaging), LLC*, 2019 WL 1501576, at *3 (N.D. Cal. Apr. 5, 2019) (upholding 20% violation rate estimate where "complaint does not describe a specific rate of missed meal or rest period but alleges a 'pattern or practice' of such violations"). But in this case plaintiff does not in fact allege defendant had a pattern and practice of denying employees meal and rest breaks. Rather, plaintiff alleges defendant "did not have a policy and practice which provided timely off-duty meal and rest breaks to plaintiff." Compl. ¶ 24; *see id.* ¶ 30. In other words, plaintiff alleges defendant failed to have a policy in place to assure employees received all their breaks and were compensated for those missed, but does not allege there was an affirmative policy, pattern, or practice of missed breaks. Plaintiff does allege a practice of failing to record those breaks that were missed (*id.* ¶ 29), but again, this suggests nothing about how often breaks were missed. Even so, this is not a case in which plaintiff utterly fails to allege anything about the frequency of the violations. In that regard, plaintiff alleges employees were required to work without their legally required breaks "from time to time." *Id.* ¶¶ 12, 91, 95.

      For defendant to assume a 10% violation rate based on allegations that there were violations from time to time is arbitrary. *See Sanders v. Old Dominion Freight Line, Inc*, 2017 WL 5973566 at *4 (S.D. Cal. Feb. 2, 2017) ("[W]ithout evidence to support this violation rate, the use of a 50% violation rate (or virtually

any violation rate for that matter) is completely arbitrary and little more than speculation and conjecture."). Although a 10% assumption is conservative compared with 50% or 20%, it is still unsupported, and therefore does not meet defendant's burden. *See Smith v. Diamond Resorts Mgmt., Inc.*, 2016 WL 356020, at *3 (C.D. Cal. Jan. 29, 2016) (assumption of one meal period and one rest break violation per week unsupported by any evidence).

In any event, even if the 10% violation rate assumption were reasonable here, as set forth above, defendant has failed to put forth reasonable or supported assumptions regarding the number of employees who worked each week, how many days they worked each week during which they were entitled to a rest break, or the hourly rate. By comparison, in other cases the courts had more reliable information before them. *See, e.g., Ibarra*, 775 F.3d at 1198-99 (noting defendant's declaration had "table listing all of its non-exempt employees and their corresponding number of shifts worked in excess of 5 hours and 3.5 hours," although still finding assumption about violation rate "not grounded in real evidence"); *Zamora*, 2020 WL 4748460, at *4 (noting assumptions "grounded in specific facts regarding the Plaintiffs' work schedules and salaries," and expert declaration "calculations took into account the frequencies at which employees earned the right to meal periods, rest breaks, and overtime pay, and in all cases 'utilized each employee's lowest hourly wage rate to determined the value' of the claims"). Here, the court could correct the hourly rate assumptions, but has no basis to estimate how many days or shifts were worked with entitlement to a break. *See Harris*, 980 F.3d at 702 (where defendant offered no proof that all class members work sufficient shifts long enough to entitle them to meal and rest periods, defendant failed to carry its burden of proof regarding the amount in controversy).

In short, many of defendant's assumptions made in support of its calculation

of the amount in controversy on plaintiff's meal and rest break claims are "unreasonable on [their] face without comparison to a better alternative." *See Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 996 (9th Cir. 2022). As such, the court finds defendant has not met its burden and its asserted amount in controversy for these claims does not support its removal of this case.

### B. Waiting Time Penalties

"Under California Labor Code § 203, an employer must pay daily wages for up to 30 days if it fails to pay all wages due within 72 hours of termination or resignation." *Chavez*, 2019 WL 1501576, at *3. This penalty accrues daily until the wages are paid. *Id.* (citing Cal. Lab. Code § 203(a)).

Defendant argues that $2,356,380 is a reasonable estimate of the amount in controversy for this claim. Opp. at 6. To reach this number, defendant started with the 1482 employees within the three-year statute of limitations who are now former employees (*see* 9/6/22 Brice Decl. ¶ 7(b)), and assumed a 100% violation rate. Opp. at 7. Defendant then multiplied the 1482 former employees by the amount of waiting time penalties due for 30 days' wages, at four hours per day, and at the supposed lowest hourly rate of $13.25, to arrive at $2,356,380 in controversy on this claim. *Id.* Plaintiff argues that waiting time penalties "are predicated on the previously pled violations" and because defendant did not provide "the total workweeks worked or total days worked in excess of four (4) hours," defendant failed to show that the 100% violation rate is proper. Reply at 10.

The main issue here is the reasonableness of assuming a 100% violation rate. The court finds it is reasonable. Plaintiff alleges the members of the class who were terminated and who had not been paid their full wages at the time of termination are entitled to waiting time penalties. *See* Compl. ¶ 113. A fair reading of the complaint is that it alleges all putative class members suffered at least some violation such that at the termination of their employment they all have

at least some unpaid wages. As defendant points out, plaintiff tied his waiting time penalties claim to defendant's alleged failure to pay a minimum wage, overtime wages, and provide the required rest breaks. Opp. at 7. It follows that "if every putative class member incurred damages for at least one other claim in the complaint, every class member who departed [employment] during the statutory period was due unpaid wages," and thus entitled to 30 days of waiting time penalties. *Chavez*, 2019 WL 1501576, at *4.

Nonetheless, the amount in controversy is not quite reasonably estimated at $2,356,380. First, this is based on a supposed lowest hourly rate of $13.25, but that was plaintiff's hourly rate, not the lowest hourly rate of the putative class. *See* 9/6/22 Brice Decl. ¶ 12. The lowest average hourly rate during the class period was $13.02 (*id.* ¶ 10), and therefore that is the rate that should be used in the calculation.

Second, defendant assumes these former employees had four-hour workdays, but the basis for that assumption is shaky. As set forth above, Ms. Brice declares that 96% of employees worked part-time, and "very few" worked less than four hours each shift (*id.* ¶ 8); but again, "very few" is vague. Based on this vague assertion, the multiplier in determining waiting time penalties should be something less than four hours, but the court is hard pressed on this record to say what that number should be. "The district court should weigh the reasonableness of the removing party's assumptions, not supply further assumptions of its own." *Harris*, 980 F.3d at 701. On the other hand, where "the *reason* a defendant's assumption is rejected is because a different, better assumption is identified," then "the district court should consider the claim under the better assumption – not just zero-out the claim." *Jauregui*, 28 F.4th at 996.

The better assumption than four hours has not been identified here. But a fair, if generous, reading of Brice's declaration may support a reasonable

assumption of a three-hour workday. Thus, multiplying 1482 former employees by 30 days by three hours by $13.02, the amount in controversy for plaintiff's waiting time penalties claim would be $1,736,607.60.

C. **Wage Statement Penalties**

California Labor Code § 226(a) requires that an employer furnish employees with an "accurate itemized statement" reflecting, among other things, all gross and net wages earned, total hours worked, and applicable hourly rates in effect during the pay period. "[A]n employer owes a penalty of $50 per initial pay period and $100 for each subsequent pay period when it fails to provide complete and accurate wage statements to employees, with an aggregate cap of $4,000 per employee." *Chavez*, 2019 WL 1501576, at *3. Plaintiff alleges that "from time to time" defendant failed to furnish accurate, itemized wage statements showing all applicable hourly rates, all overtime hourly rates, and all gross and net wages earned. Compl. ¶ 100.

Defendant estimates that the penalties for issuing non-compliant wage statements amount to $3,837,200. Opp. at 7. Defendant supports this figure by multiplying 1448 (the number of employees in a one-year limitations period (9/6/22 Brice Decl. ¶ 7(c))) by 26 pay periods and by the $100 penalty for each inaccurate workweek. Opp. at 7-8. Defendant then adds to this figure the calculation of the initial pay period penalty, 1448 employees times $50. *Id*. Defendant claims its 100% violation rate assumption is reasonable because plaintiff made "broad allegations that Defendant systematically failed to pay putative Class Members proper overtime wages, meal period premiums, and rest break premiums." Opp. at 8 (citing Compl. ¶¶ 100 - 101).

Defendant has again failed to meet its burden here, for two reasons. First, and most basically, defendant apparently assumes two-week pay periods, and

therefore 26 wage statements over the course of a year.¹ But there is absolutely no evidence in the record as to how long defendant's pay periods were, or how many wage statements were issued to the 1448 employees. Neither of the Brice declarations touches on this, although this information should be readily in defendant's possession. *See* 9/6/22 Brice Decl. ¶ 4. Without any basis for determining the number of statements at issue, it is impossible to calculate the amount of wage statement penalties in controversy.

Second, defendant's assumption of a 100% violation rate is unsupported. Unlike waiting time penalties, which are effectively triggered when there is a single violation at any time for any employee, wage statement penalties only apply if there is a pay or recording violation (resulting in an inaccurate wage statement) for each statement in question. Defendant argues it is reasonable here to assume at least one violation for each employee for each pay period given the allegations in this case. Courts have upheld such assumptions where complaints alleged a consistent policy or uniform practice of violations. *See Lucas v. Michael Kors (USA), Inc.*, 2018 WL 2146403, at *9 (C.D. Cal. May 9, 2018) (where plaintiff alleged "consistent policy" of failing to provide breaks then wage statements "would necessarily have been inaccurate 100% of the time"); *Moppin v. Los Robles Reg'l Med. Ctr.*, 2015 WL 5618872, at *3 (C.D. Cal. Sep. 24, 2015) (upholding 100% violation assumption where complaint alleged defendants "uniformly and systematically" failed to furnish accurate wage statements "[a]t all times"). By contrast, here plaintiff alleges defendant failed to provide employees with accurate wage statements "from time to time." Compl. ¶ 100. This does not support a 100% violation rate.

---

¹ If this is so, then it seems defendant should have found one $50 penalty plus 25 $100 penalties for each employee over the course of the year rather than 26 $100 penalties.

13

Accordingly, for two separate reasons, there is no basis in the record to determine how many wage statements may be at issue, leaving no basis to consider an alternative potential amount in controversy. *See Jauregui*, 28 F.4th at 996; *Harris*, 980 F.3d at 701. Defendant has not met its burden, and therefore its asserted amount in controversy for this claim does not support its removal of this case.

### D. Attorneys' Fees

Defendant also includes attorneys' fees in its calculation of the amount in controversy. *See Fritsch*, 899 F.3d at 794 ("a court must include future attorneys' fees recoverable by statute or contract when assessing whether the amount-in-controversy requirement is met"). Defendant calculates that plaintiff's claims implicate $2,104,632.50 in attorneys' fees, using a benchmark of 25% of projected damages for the meal and rest break, waiting time, and wage statement penalties. Opp. at 9. But although using a 25% benchmark has been found reasonable in some cases, the Ninth Circuit has explicitly "reject[ed] [the] argument that [it] should hold that, as a matter of law, the amount of attorneys' fees in controversy in class actions is 25% of all other alleged recovery." *Fritsch*, 899 F.3d at 796. Rather, "the defendant must prove the amount of attorneys' fees at stake by a preponderance of the evidence," with such calculation taking into account the applicability of any contractual or statutory requirements, such as whether the lodestar method applies. *Id.*

By simply assuming a 25% benchmark here, defendant has not met its burden with respect to the calculation of attorneys' fees at issue. Moreover, even if the court were to accept the 25% benchmark, as set forth above, the only amount in controversy defendant has met its burden to demonstrate on any claim is $1,736,607.60 for waiting time penalties. Adding 25% to that for attorneys' fees would result in a total of only $2,170,759.50 in controversy here, well below the

14

$5 million required for removal.

For these reasons, defendant has failed to prove, by a preponderance of the evidence, that the amount in controversy exceeds the $5 million CAFA threshold for removal.

## IV.
## **CONCLUSION**

IT IS THEREFORE ORDERED that plaintiff's motion to remand (docket no. 24) is granted. The Court Clerk is directed to remand this action to the Superior Court of the State of California for the County of Los Angeles.

DATED: February 7, 2023

_____
SHERI PYM
United States Magistrate Judge